30 C.C.P.A. (Patents)

## MEEM–HASKINS COAL CORPORATION v. CENTRAL FUEL CORPORATION.
### Patent Appeal No. 4780.

Court of Customs and Patent Appeals.
July 6, 1943.

Donald S. Caruthers, of Washington, D. C. (E. W. Mollohan, Jr., of Washington, D. C., of counsel), for appellee.

Wm. J. Grant and Charles R. Allen, both of Washington, D. C., for appellee.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

BLAND, Associate Judge.

This is an appeal from the decision of the Commissioner of Patents of the United States Patent Office in a trade-mark opposition proceeding wherein Meem-Haskins Coal Corporation (hereinafter referred to as opposer) filed notice of opposition to the registration by the Central Fuel Corporation (hereinafter referred to as applicant) of the trade-mark "Original Green Ridge" as used in the sale of coal.

The record shows, among other things, that the opposer, since 1921, has been engaged in mining bituminous coal at Emmons, Kentucky; that since about 1925 it has been marketing its coal through exclusive sales agents; that in the year 1925 the Columbus Mining Company was its exclusive sales agent and at that time it began selling its coal under the notation "Green Ridge," while Mr. Haven A. Requa was sales manager of the Columbus Mining Company. He suggested the name "Green Ridge," and that term was used when the Carbon Glow Mines, Inc., took over the exclusive sales contract formerly held by the Columbus Mining Company.

The Columbus Mining Company, before its relationship with opposer was severed, purchased one of the mines of opposer from which said "Green Ridge" coal had been mined and sold, and it continued to sell coal from said purchased mine under the notation "Green Ridge."

Carbon Glow Mines, Inc., proceeded to sell opposer's coal under the notation "Original Green Ridge," which is the mark here sought to be registered. In 1931 that company was consolidated with or absorbed by the Central Fuel Corporation, the applicant.

Applicant acted as exclusive sales agent for opposer, with the exception of a short period in 1932, up to 1940, when the contract between applicant and opposer was terminated, the termination taking place some three months after applicant had filed the here-involved application. Opposer, since the termination of said agreement, has been selling its coal through the Sunday Creek Coal Company, as exclusive sales agent.

Applicant does not produce coal but, as sales agent, sells a number of different brands produced at various mines.

The contract between opposer and applicant was not introduced in evidence. It appears from the record, however, that by the terms of the contract, applicant was constituted exclusive sales agent of opposer and that applicant, through its salesmen, secured orders for "Original Green Ridge" coal, placed the orders on blanks which it furnished, and sent them to opposer, who filled the orders by loading the coal on cars and shipping it to the purchasers; that sometimes labels were placed on the cars or on the coal but that most of the time the coal or the cars were not labeled with any trade-mark designation. The shipping papers disclosed that it was "Original Green Ridge" coal that was being shipped. Applicant was responsible for the payment for the coal, made collections thereof, and remitted to the opposer, the commission retained by applicant not being disclosed. The expense of advertising the "Original Green Ridge" coal to the coal-purchasing trade was paid by applicant.

We think it is made clear from the record that in the sales of "Original Green Ridge" coal the purchaser was informed that the coal, the quality of which was well and favorably known, was the product of opposer.

The Examiner of Interferences, after stating the facts substantially as set out above, said:

"It seems to the examiner under the foregoing circumstances, at least in the absence of a definite understanding between the parties that use of 'Original Green Ridge' as a trade mark during the period of their association was to inure exclusively to applicant's benefit, that the applicant's activities in promoting the sale of opposer's coal under this mark have been carried out merely in the capacity of an agent. There is no evidence in the record which is deemed sufficient to establish the existence of such an understanding, and in accordance with well known principles of agency the opposer rather than the applicant is therefore deemed to be an owner of the mark.

"The fact referred to by applicant that the mark has appeared in advertisements and on labels for the goods in association with applicant's name and without reference to its status as an agent of opposer

is deemed not to be material here. As stated by the Court in the case of Shaver et al. v. Heller & Merz Co., 8 Cir., 108 F. 821, 824, 65 L.R.A. 878: 'One does not lose the good will of his trade in an article * * * by placing upon it the names of his customers who are engaged in selling it, nor by the fact that the consumers know only the name and excellence of the article, and neither know nor care who makes it.'

"Accordingly, the notice of opposition is hereby sustained and it is further adjudged that the applicant is not entitled to the registration for which it has made application."

Upon appeal to the Commissioner of Patents, the decision of the Examiner of Interferences was reversed. The commissioner said:

"Applicant's predecessor in business in soliciting orders as exclusive selling agents for the 'Original Green Ridge' mine located at Emmet, Kentucky, assured the trade that the coal would be the original product of that mine and that customers could 'depend upon its quality, preparation and service.'

"On the order blanks of applicant's predecessor in business that company's name appeared as the seller and there was printed on the order slip the following: 'Seller is responsible for any loss occasioned by improper preparation of coal or coke and for any loss occasioned by failure to ship in accordance with agreement of purchase or through failure to properly forward prompt notice of shipment.'

"Apparently the understanding was that applicant, or its predecessor in business would not apply the name to any coal other than that particular coal from that particular mine. However applicant at times, and without objection by opposer, did ship coal like opposer's coal in grade and character, but produced at other mines, in filling orders for 'Original Green Ridge' coal to meet exceptional situations. Also, during a brief period when applicant was unable to function, opposer, without objection from applicant, arranged with other concerns to sell opposer's coal under the name 'Original Green Ridge.' I regard these instances of departure from the normal routine of operation under the agreement as insignificant since they were due to special circumstances and were so recognized by both parties.

"The above, I think, gives a fair picture of what the record shows, except possibly it may be added that apparently it was an officer of applicant's company who suggested the name for the coal.

"Thus it appears that although applicant was known as opposer's selling agent, actually applicant's business of selling the coal under the trade-mark 'Original Green Ridge' was its own business and not the business of opposer, and I believe this was recognized by purchasers from the fact that applicant's name, and not opposer's, appeared on the advertising and order blanks, that orders were directed to applicant and the purchase price was to be paid to applicant on bills rendered by applicant, and applicant was responsible for supplying purchasers with the coal that was ordered and for its condition. Opposer was obligated merely to ship the coal as and when ordered to do so by applicant and for the account of applicant, and opposer was obligated to applicant and not applicant's customers to maintain the character, quality and condition of the coal.

"I do not consider the application of the mark by opposer, at the request of applicant, to coal shipped to applicant's customers on applicant's orders and for applicant's account to constitute trade-mark use of the mark by opposer in its business of producing coal and allowing it to be sold by applicant."

It is the contention of opposer that applicant was merely the agent of the producer of "Original Green Ridge" coal; that the ownership of the mark was always in the opposer; that applicant's use of the same was for the opposer; that the coal-purchasing public knew of the excellent qualities of opposer's coal and purchased it with the full knowledge that it was opposer's product; and that to permit applicant to assert exclusive ownership and right of use of the mark would greatly damage opposer and be confusing to the coal-purchasing public.

Applicant contends that while it was styled "sales agent" in the contract and referred to as such in the testimony and on the labels and other documents, the ordinary principles of the law of agency do not control because it acted in the nature of a distributor; that the distribution business was its own; that since the mark was originated by applicant or its predecessor and exclusively used by

it, it is therefore the owner of the mark and entitled to the exclusive use which the right of registration presumes. Applicant does not assert that title to the coal ever passed to it.

In the record, as an exhibit introduced by opposer, is a letter written by said H. A. Requa, as the then vice-president of the Carbon Glow Mines, Inc., to S. H. Meem president of opposer. Appearing therein is the following statement:

"Mr. Grethel and Mr. Mondey have been after me for quite a time asking for permission to sell your coal as 'Original Green Ridge.' I have rather side stepped the proposition to date owing to the fact that, irrespective of what the Columbus Mining Company do to me or try to do, the record of Carbon Glow Mines, Inc., will be absolutely clean.

"Mr. Mondey now tells me that he thinks we have a legal right to sell your coal as 'Original Green Ridge' and under the circumstances we have an ethical right to do this too. As I understand it, Mr. Mondey talked to you when he saw you last in regard to the proposition and heard from you that one of your legal friends said such a course of procedure was o. k. If from a legal standpoint we have a right to sell your coal as Green Ridge, then, perhaps, we ought to do it, but first can you help me out and tell me just what our status is from a legal standpoint?"

At the time this letter was written, the Columbus Mining Company was, by a tacit agreement with opposer, selling its coal under the trade term "Green Ridge," that is, coal produced from the mine purchased from opposer. It is important to note that Mr. Requa, vice-president of the Carbon Glow Mines, Inc., applicant's predecessor, thought it necessary to obtain permission from the producer of the coal before using the new mark "Original Green Ridge."

Another significant fact which appears from the testimony of Mr. Requa is his quotation from applicant's Exhibit 1 (a photostat of a page from *Mac's Coal Directory and Buyers' Guide* of 1938) as follows:

"Q. 43. And what is the rest of that line that runs across there and was just referred to, on that page 159? A. *'Operating Company, Meem-Haskins Coal Corporation; General Offices, Lynchburg, Virginia; name of mine, Meem-Haskins;* Railroad, L & N; shipping Point, Jeff; Seam or vein, Hazard No. 4; cars daily, 17; *Sales agents, Central Fuel Corporation'*. [Italics ours.]

"Q. 44. Calling your attention to an advertisement at the bottom of this page 159, running clear across the page about an inch and a half in depth, I will ask you whether that bears the name of 'Central Fuel Corporation' or not? A. Yes.

"Q. 45. Does it also bear any reference to 'Original Green Ridge?' A. Yes, the trademark and the trade name is used.

"Q. 46. Do you know who paid for that advertisement? A. Central Fuel Corporation.

"Q. 47. Do you know whether the opposer was aware of the fact that the advertisement was put in there? A. Yes."

On this Exhibit 1 is an advertisement by the Central Fuel Corporation in which it is disclosed that that company sold "Original Green Ridge" coal—Hazard No. 4, and the "Original Green Ridge" trademark is displayed on the ad. The significant feature of the quotation from the directory is the fact that the purchasing public was informed of the Meem-Haskins mine and the seam or vein of coal which it mined and that "Original Green Ridge" coal came from the vein named as Hazard No. 4.

Another exhibit, introduced by the opposer, Exhibit 19, is a photostat of a portion of Black's Coal Directory, 7th Ed., in which it is shown that Meem-Haskins Coal Corporation, at its Emmons mine at Emmons, Kentucky, sold "Original Green Ridge" coal through the Central Fuel Corporation as its "Sales Agent."

When the purchaser read literature of this character, distributed to the coal-purchasing public, he knew that he was obtaining opposer's product, mined at a well-known mine, and nothing in this record indicates that the title to the coal at any time ever passed to the selling agents. This is true notwithstanding the fact that the record does disclose that the sales agent was obligated to the purchaser to see that he was reimbursed for any loss occurring in the manner stated on the order blank and also was obligated to collect and remit to opposer the selling price of the coal.

Under all these circumstances, it seems to us that if applicant is given the exclusive use of the trade term together with

the right to place it upon any character of coal, the opposer would be damaged as alleged, and the public would be confused and misled. We do not think that applicant has shown that in a trade-mark sense it is the owner of and thus entitled to the exclusive use of the mark in a trade-mark sense—which it must show prior to registration. It must be remembered that it is not necessary in this case for opposer to prove that it has the exclusive right to use the term. It is not applying for registration. It opposes the registration by another, which registration would presumptively imply exclusive ownership in the registrant. Whether the applicant has the right to use the mark or whether the opposer has the exclusive right to use it need not be determined. Since from the foregoing facts it seems clear that applicant does not have the exclusive right to use the term, and that damage would flow to opposer from the registration sought by applicant, the opposition should have been sustained and the applicant denied the privilege of registration.

■■ In Coschocton Glove Co. v. Buckeye Glove Co., 90 F.2d 660, 663, 24 C.C.P.A., Patents, 1338, this court said: "One distinction between a trade-mark interference proceeding and a trade-mark opposition proceeding is that in the latter one does not have to show ownership of a mark in order successfully to oppose its registration to another while in the former (which does not involve any question of damage) ownership by one or the other of the parties must be established in order to secure registration. The sustaining of an opposition is equivalent to a holding that the party seeking to register is not the owner of the mark, but it does not follow that the opposing party necessarily is the owner."

■ This court has frequently called attention to the fact that in many instances, distinction between the right to use and the right to register must be kept in mind. Under the principles of equity, it often happens that by virtue of the conduct of the parties, more than one may use a trade-mark, but only one can have ownership of it in a trade-mark registration sense.

■ Applicant seeks to bring itself within the line of cases which support the well-settled principle that a salesman or distributor may, under certain circumstances, originate and have exclusive use and ownership of a trade-mark upon goods which he sells but does not produce. Examples of such situations are found in Nelson v. Winchell & Co., 203 Mass. 75, 89 N.E. 180, 23 L.R.A.,N.S., 1150, and Distillers Brands, Inc., v. American Distilling Company, D.C., 26 F.Supp. 988, 989. In the latter case a bottler of whisky prepared for one of its customers, King Distributing Company, a special label bearing the term "King's Pride" and affixed the labels to all the bottles delivered to the King Company. After building up a trade in "King's Pride" whisky the King Company began to purchase whisky from another source but continued to use the "King's Pride" labels. The first bottling company complained of such use. There the court said: "* * * Where a trademark indicates a distributor or [of] merchandise rather than the maker, it is the distributor who acquires the trademark rights. For the public associates the goods so marked with the distributor *and knows not the identity of the maker.* * * *." [Italics ours.]

■ Applicant, under the facts stated, does not bring itself within the operation of that principle. An example of such a situation would be a firm like Sears, Roebuck Co. or Montgomery Ward & Co., which purchases great quantities of articles and sells under its own trade-names, the consuming purchasers rarely, if ever, knowing by whom or where the articles are produced. The purchasers buy solely upon the reputation and responsibility of the vendor and not of the producer. Title to the goods sold to the consumers is in the seller and not in the original producer. The instant record discloses that the purchasing public, although it may have confidence in the applicant, knows it is buying a certain kind of coal produced in a certain mine by a certain producer.

The decision of the commissioner is reversed.

Reversed.

LENROOT, Associate Judge, took no part in the consideration or decision of this case.