THIS OPINION IS A
PRECEDENT OF THE TTAB

Mailed:
July 3, 2014

# UNITED STATES PATENT AND TRADEMARK OFFICE

———

## Trademark Trial and Appeal Board

———

Kristin Marie Conolty d/b/a Fairway Fox Golf

v.

Conolty O'Connor NYC LLC

———

Opposition No. 91206045
to Application Serial No. 85522419

———

Jennifer A. Dukarski and Laura Johnson of Butzel Long for Kristin Marie Conolty d/b/a Fairway Fox Golf.

Kristen K. Leibensperger of Leibensperger Law PC for Conolty O'Connor NYC LLC.

———

Before Cataldo, Taylor and Adlin, Administrative Trademark Judges.

Opinion by Adlin, Administrative Trademark Judge:

This case is essentially an ownership dispute over the mark FAIRWAY FOX for golf clothing, between former business partners Kristin Marie Conolty and Kathryn O'Connor. It specifically concerns Conolty O'Connor NYC LLC's ("Applicant") application for registration of the mark FAIRWAY FOX, in standard

characters, for "Golf and tennis clothing, namely, skirts, shorts, skorts, dresses, pants, shoes, hats, shirts, sweaters, vests, socks, visors, t shirts, and jackets."[1]

Kristin Marie Conolty d/b/a Fairway Fox Golf ("Opposer") opposes registration of Applicant's mark, alleging prior use of an identical mark for identical goods and that use of Applicant's mark would be likely to cause confusion with Opposer's mark. Notice of Opposition ("NOO") ¶¶ 2-4, 17. Opposer specifically alleges, "upon information and belief," that Ms. O'Connor formed Applicant "as a single member limited liability company" on June 14, 2011, but that before that time, Ms. O'Connor worked with Opposer in connection with FAIRWAY FOX clothing. *Id.* ¶¶ 5-7. As discussed further below, Opposer also alleges, as another ground for opposition, that Applicant is not the owner of the involved mark.

In its answer ("Answer"), Applicant denies the salient allegations in the notice of opposition. It also asserts, as affirmative defenses, that Opposer "lacks standing," and is barred from opposing the application by "unclean hands" as a result of "acting in bad faith," and by "waiver" and "estoppel" by virtue of consenting to and participating in Applicant's use of the involved mark and the filing of the involved application.[2] Answer ¶¶ 19-22.

On October 2, 2013, the parties filed a stipulation to forego a traditional trial and instead resolve this dispute via the Board's Accelerated Case Resolution

---

[1] Application Serial No. 85522419, filed January 23, 2012, alleging first use anywhere on June 1, 2008 and first use in commerce on June 1, 2009.

[2] Applicant also asserts, as an "affirmative defense," that Opposer has not used FAIRWAY FOX in commerce and therefore "has no priority of use" or rights in the mark. Answer ¶ 18. This "defense" is in fact merely an amplification of Applicant's denials of Opposer's allegations.

("ACR") procedure. Specifically, the parties agreed to file briefs similar in form to cross-motions for summary judgment, with their evidence attached, which evidence "is authentic for purposes of admission … and deemed properly of record for purposes of the ACR trial and the Board's final ACR decision."[3] As in any ACR case, the parties agreed that "[t]he Board may resolve any genuine issues of material fact, including the drawing of reasonable inferences from any such fact(s) …." The Board approved the parties' ACR stipulation in its order of October 23, 2013, and therein clarified, based on a teleconference between the parties and the Board, that the parties: (1) may present testimony by declaration or affidavit; and (2) "stipulated that there is a likelihood of confusion between their marks and that briefing would be limited to the issue of priority of use and any of the defenses asserted in Applicant's pleading."

### Whether a Claim of Nonownership Was Pleaded or Tried by Implied Consent

While the Electronic System for Trademark Trials and Appeals ("ESTTA") coversheet for the notice of opposition indicates that the only ground for opposition is likelihood of confusion, limited by stipulation to the issue of priority, it appears that Opposer also intended to allege nonownership as another ground for opposition.[4] Indeed, Opposer alleges that:

---

[3] The parties reserved the right to "make evidentiary, relevance, and other objections" to the evidence.

[4] While likelihood of confusion and nonownership are distinctly different claims, at the same time Opposer's allegation of priority is entirely consistent with, and part and parcel of, its allegations regarding ownership. *In re Trade-Mark Cases*, 100 U.S. 82, 94 (1879) ("At common law the exclusive right to it grows out of the use of it, and not its mere adoption ….

3

- "Applicant is an entity who has sought to distribute and/or sell Opposers' (sic) goods in the United States. Opposer has not, however, licensed or otherwise authorized Applicant to distribute Opposer's goods in the United States or to use Opposer's FAIRWAY FOX mark in the United States." NOO ¶ 9.

- "Opposer is the owner of the FAIRWAY FOX mark pursuant to Section 1 of the Trademark Act, 15 U.S.C. § 1051." *Id.* ¶ 13.

- "No 'parent and wholly-owned subsidiary relationship' exists between Opposer and Applicant as described in TMEP § 1201.06(a)(1)," and Applicant has not submitted: (a) Opposer's consent to Applicant's registration of the FAIRWAY FOX mark, (b) a written acknowledgement that Applicant owns the mark or (c) an assignment from Opposer to Applicant of rights in the mark and the goodwill associated therewith. *Id.* ¶¶ 14, 15.[5]

- "Applicant is not entitled to registration of the FAIRWAY FOX mark pursuant to Section 1 of the Trademark Act, 15 U.S.C. § 1051." *Id.* ¶ 16.

These allegations state a claim for nonownership. Indeed, Opposer cites Section 1 of the Trademark Act, 15 U.S.C. § 1051, which provides that "[t]he owner of a trademark used in commerce may request registration," and specifically alleges that it owns the involved mark, and that Applicant is not entitled to register it under Section 1. NOO ¶¶ 13, 16. Opposer also refers to Applicant as Opposer's distributor, and cites to a section of the TMEP which specifically provides that distributors do not acquire ownership rights in marks used on goods they distribute, and may not register marks absent a parent and wholly-owned subsidiary

---

It is simply founded on priority of appropriation."); *Hydro-Dynamics Inc. v. George Putnam & Co., Inc.*, 811 F.2d 1470, 1 USPQ2d 1772 (Fed. Cir. 1987).

[5] The heading of TMEP § 1201.06 is "Special Situations Pertaining to Ownership."

relationship or a written agreement, both of which, Opposer alleges, are absent here. *Id.* ¶ 15.

Even if Opposer's allegations were found to not state a claim of nonownership, it is clear that the issue was tried by implied consent.[6] In fact, both parties introduced evidence on the issue of ownership, and neither objected to the other's evidence relating to ownership. Moreover, the heading of Section VI(B) of Opposer's ACR brief is "Applicant is not entitled to registration because Opposer has priority as the proper owner pursuant to Section 1 of the Trademark Act, 15 U.S.C. § 1051." In that section, Opposer argues that "[o]nly the owner of a trademark may register the mark with the USPTO," and that several factors often used to determine who owns a mark "support the ownership of the mark by Opposer." Opposer's ACR brief at 9 (citing, *inter alia*, *Wrist-Rocket Mfg. Co. v. Saunders*, 379 F.Supp. 902, 183 USPQ 17 (D. Neb. 1974), *aff'd in part and rev'd in part*, 516 F.2d 846, 186 USPQ 5 (8th Cir. 1975)). The section concludes with the statement that "Opposer is the appropriate owner of FAIRWAY FOX." Sections VI(C) and (E) of Opposer's ACR brief also argue, *inter alia*, that Opposer "is the proper owner of the mark," and "is entitled to be the valid owner of the FAIRWAY FOX mark," respectively, while Section VI (D) argues that Applicant "is not the proper owner." Opposer's ACR brief at 13, 20, 22.

For its part, Applicant also couches this case, at least in part, as an ownership dispute, stating that Opposer "has no independent ownership rights in

---

[6] Again, we do not view the parties' agreement that briefing "would be limited to the issue of priority of use" as necessarily inconsistent with briefing the issue of ownership.

the FAIRWAY FOX trademark," and that "opposer lacks an ownership interest in the FAIRWAY FOX trademark." Applicant's ACR brief at 1, 7. The heading of Section II of Applicant's ACR brief is "applicant owns the FAIRWAY FOX trademark as it was the first and only entity to use the mark in commerce," and in that section Applicant refers to this proceeding as an "ownership dispute." *Id.* at 9. Applicant also agrees with Opposer that the factors set forth in *Wrist-Rocket* and "the legal standard to show who owns the mark may be applied to the case at hand." *Id.* at 10. *See also*, Applicant's opposition to Opposer's ACR brief at 2 ("these facts show that Applicant is the rightful owner of the mark Fairway Fox").

In other words, far from being surprised by Opposer's evidence and arguments regarding ownership, Applicant presented similar evidence and made similar arguments itself. Neither party objected to the other's evidence or arguments regarding ownership. And the parties' dispute does not center on competing golf clothing sold under similar marks, but instead the *same* clothing sold under the *same* mark. Accordingly, under Fed. R. Civ. P. 15(b)(2) and TBMP § 507.03(b), we find that even if we were to assume that Opposer did not plead a claim of nonownership, such a claim was tried by implied consent. As we stated in *Nahshin v. Product Source International LLC*, 107 USPQ2d 1257 (TTAB 2013) in analogous circumstances:

> Although the proceeding was brought on the ground of priority/likelihood of confusion, the actual issue in this matter is ownership of the mark NIC-OUT/NIC OUT in the United States, as the cigarette filters that respondent sells under the mark NIC OUT are the same filters that petitioner arranged to have manufactured under the

> mark NIC-OUT. In fact, petitioner alleges in the amended petition for cancellation that petitioner is the owner of the mark NIC-OUT. Amended Petition, ¶ 1. During testimony, petitioner introduced evidence for the purpose of supporting this claim, and in his brief, he argued that respondent is not the owner of the NIC OUT mark. Moreover, respondent states in its answer that "Plaintiff-Petitioner does not now and has not ever owned the mark NIC-OUT," Answer ¶ 1, and during testimony, respondent introduced evidence for the purpose of supporting this position. In its brief, respondent requested that we not consider ownership to be a ground, characterizing it as a "new claim of lack of ownership of trademark registration." Respondent's Brief, p. 2. Respondent's argument to the contrary notwithstanding, it is clear not only that respondent had fair notice of this issue, but also actively defended against it on the merits. In other words, the issue was tried and was argued by both parties in their briefs.

*Id.* at 1258[7]; *see also, John Anthony, Inc. v. Fashions by John Anthony, Inc.*, 209 USPQ 517 (TTAB 1980) (although Opposer pleaded only priority and likelihood of confusion, "[t]he basic question to be determined in this case is whether the mark "JOHN ANTHONY" is owned by opposer or by applicant").

## The Record

The record consists of the pleadings, the file of the involved application and the following evidence attached to the parties' ACR briefs:[8]

- Attached to Opposer's ACR brief (TTABVue Dkt. # 15): correspondence between the parties and between

---

[7] Whereas the respondent in *Nahshin* objected to consideration of a nonownership claim, Applicant in this case not only did not object but in fact argued the same issue.

[8] Much of the evidence introduced through the parties' ACR briefs would normally be inadmissible unless introduced through a testimonial deposition. *Compare* Trademark Rule 2.122(e) *with* Trademark Rule 2.123. However, the parties' ACR stipulation allowed them to introduce evidence simply by attaching it to their ACR briefs. ACR Stipulation; Board's order of October 23, 2013.

7

Opposer and Ms. O'Connor; correspondence between suppliers and one or both of the parties or their principals; invoices from suppliers to one or both of the parties or their principals; corporate, tax and regulatory filings; sketches; business plans and summaries; promotional materials; trade show materials; materials related to the involved application; draft organizational documents; meeting agendas and minutes; financial records and projections; product order forms; sales proposals; printouts from the parties' websites; and catalogues.

· Attached to Applicant's ACR brief (TTABVue Dkt. # 16): Declarations of Kathryn O'Connor ("O'Connor Dec.") and Kristen K. Leibensperger, Applicant's attorney ("Leibensperger Dec."); correspondence between the parties and between Opposer and Ms. O'Connor; business plans and summaries; materials related to the involved application; photos of FAIRWAY FOX products and hangtags; Applicant's interrogatories and document requests to Opposer; promotional materials; printouts from the parties' websites; proposals from a branding consultant; corporate filings and drafts thereof; and invoices from suppliers to one or both of the parties or their principals.

· Attached to Applicant's opposition to Opposer's ACR brief (TTABVue Dkt. # 19): correspondence from the Federal Trade Commission; invoices from suppliers to one or both of the parties or their principals; and financial records.

The parties do not object to any evidence of record, and in large part rely on the same evidence, disagreeing only as to its legal significance.

### Underlying Facts Regarding the Use and Ownership of FAIRWAY FOX

In June or July of 2008, Opposer, Ms. Conolty, and her friend,[9] Ms. O'Connor, began preparations to offer a new line of upscale, fashionable golf clothing.

---

[9] In e-mail correspondence to "brainstorm" a description of Fairway Fox, Ms. Conolty refers to herself and Ms. O'Connor as "two cousins." Leibensperger Dec. Ex. F.

Opposer's father coined the name and mark FAIRWAY FOX, which Opposer adopted as a trade name and trademark for the clothing line. Beginning in October 2008, Opposer, who has a fashion background, started designing and working with vendors to produce samples of FAIRWAY FOX golf clothing. Opposer's ACR Brief at 2 and Exs. A, C, I; Applicant's ACR Brief at 2; O'Connor Dec. ¶¶ 2-8 and Exs. A-B. Ms. O'Connor assisted or consulted in Opposer's efforts to design the clothing and produce samples. O'Connor Dec. ¶ 8. On or around November 11, 2008, Opposer obtained an employer identification number ("EIN") from the Internal Revenue Service as a sole proprietor doing business as "Fairway Fox Golf," and in her application for the EIN listed her "start date" as November 2008. Opposer's ACR Brief at 2 and Ex. D. The record does not reveal any significant public use of the FAIRWAY FOX mark in 2008, however.

Ms. O'Connor registered the domain name "fairwayfoxgolf.com" in early 2009. O'Connor Dec. ¶ 9. Also in 2009, Opposer and Ms. O'Connor sent samples of their clothing to potential customers "to test the performance and fit." *Id.* ¶ 8.

Ms. Conolty and Ms. O'Connor are identified as "Co-Owners Fairway Fox," and "the designers of Fairway Fox" in what both parties identify as a description from the FAIRWAY FOX website. Opposer's ACR brief at 3 and Ex. J; Applicant's ACR brief at 3 and Leibensperger Dec. Ex. E. Similarly, Conolty and O'Connor are identified as Fairway Fox's "founders" in a revised draft of the Fairway Fox business plan which Ms. Conolty sent to Ms. O'Connor on December 7, 2010. O'Connor Dec. ¶ 10 and Ex. C. Ms. O'Connor provided most or all of the business's

funding, and has "invested over $175,000 in the business to date." *Id.* ¶ 11; Opposer's ACR Brief at 5 and Ex. T. It appears that in October 2010, Ms. Conolty and Ms. O'Connor began, and then discontinued, the process of registering a d/b/a through legal services provider LegalZoom. *Id.* and Ex. U.

While it appears that Ms. Conolty had primary responsibility for dealing with vendors and for the "fashion" (as opposed to financial or business) side of the Fairway Fox operation, at the same time, Ms. O'Connor was copied on at least some of the "fashion"-related correspondence and had at least some input into that side of the business. Opposer's ACR Brief Exs. B and C; Leibensperger Dec. Ex. F, G. Indeed, it is clear that vendors and others viewed both Ms. Conolty and Ms. O'Connor as being associated with Fairway Fox. Similarly, while it appears that Ms. O'Connor had at least some responsibility for the "business" side of the operation, Ms. Conolty also participated and had input into that side of the company. Leibensperger Dec. Exs. F, H; Opposer's ACR brief Exs. O, S, U.

Applicant was formed on June 14, 2011, and is named after both Ms. Conolty and Ms. O'Connor. Leibensperger Dec. ¶ 8 and Ex. M. In fact, on June 8, 2011, the week before Applicant's formation, Ms. Conolty sent Ms. O'Connor an e-mail proposing three names for the entity, the name ultimately chosen as well as "Conolty O'Connor TriBeCa" and "Conolty O'Connor Gramercy." O'Connor Dec. ¶ 12 and Ex. D. The e-mail proposes identifying Ms. O'Connor as the entity's CEO and Ms. Conolty as its President, and suggests using Ms. O'Connor's address as the entity's address. *Id.* Ms. O'Connor testifies that "[b]ecause I had fully financed

Fairway Fox I was the sole shareholder of Conolty O'Connor NYC LLC," and "I anticipated Opposer's ownership interest to vest overtime (sic) as we continued to work on the apparel line and after I recouped my initial capital investment." *Id.* ¶¶ 14-15; Opposer's ACR brief Ex. N. There is no evidence that Ms. Conolty ever agreed that Ms. O'Connor should or would be Applicant's sole shareholder, however.

While the parties agree that Ms. O'Connor ultimately became Applicant's sole member/owner, the documents of record relating to the company are primarily drafts, proposals and/or empty forms, including formation documents, an operating agreement and minutes. Opposer's ACR brief Ex. M. It is not clear from this or any other evidence whether or to what extent Ms. Conolty was involved in Applicant's formation, other than proposing names for the entity and titles for herself and Ms. O'Connor. It is also not clear whether Ms. Conolty transferred, or intended to transfer, any part of the business to Applicant. In any event, Applicant, through Ms. O'Connor, applied for and received its own EIN in June 2011. *Id.* Ex. N.

Following Applicant's formation, Opposer, Ms. O'Connor and Applicant continued to work together. For example, on September 12, 2011, Ms. Conolty, acting on Applicant's behalf, obtained Applicant's "registered identification number" from the Federal Trade Commission. Leibensperger Dec. Ex. N.[10] It appears that the outside world perceived Applicant (and Ms. O'Connor) and Opposer (through her d/b/a), as a single enterprise: "Fairway Fox." Indeed, while most vendors appear to have dealt with Ms. Conolty more than Ms. O'Connor, one hangtag

---

[10] Vendors may label products using their RIN in lieu of their official name.

vendor at times billed "Fairway Fox," via Ms. Conolty, but shipped the hangtags to Ms. O'Connor. *Id.* Ex. C. A clothing vendor's invoice indicates that the order was approved by "Kristy Conolty/Kathryn."[11] *Id.* Certain forms, which are not well identified, bear the caption "Conolty O'Connor dba Fairway Fox" above the FAIRWAY FOX mark. *Id.* Ex. Q.

In January 2012, Ms. Conolty and Ms. O'Connor worked together to file the involved application, through LegalZoom. *Id.* Ex. L; O'Connor Dec. ¶ 20. Ms. O'Connor signed the application on Applicant's behalf identifying herself as "CFO." Also in January 2012, Ms. Conolty and Ms. O'Connor participated in the 2012 PGA Merchandise Show. Opposer's ACR brief at 10 and Ex. C. The invoice for their participation was sent to "Fairway Fox Golf" care of Ms. Conolty, and Ms. O'Connor paid for their participation. *Id.* Exs. K, T. Both parties agree that FAIRWAY FOX merchandise was first sold at the PGA show. *Id.* at 10; Applicant's ACR brief at 5-6; O'Connor Dec. ¶ 17.[12]

The parties stopped working together in May 2012. O'Connor Dec. ¶ 21. On May 16, 2012, Ms. Conolty sent an e-mail to Ms. O'Connor stating

> With all due respect I cannot continue with Fairway Fox under your proposed split. I am sorry you feel I am only worth 20% of this company. That is incredibly disappointing, and insulting, considering the amount of work and time I put into this company. From the

---

[11] Kathryn is Ms. O'Connor's first name.

[12] The evidence belies Applicant's claim that "As of June 2011 the Founders [Ms. Conolty and Ms. O'Connor] ceased doing business under the mark and the business was taken over by the corporation." Applicant's Opposition to Opposer's ACR brief at 5. In fact, Ms. Conolty and Ms. O'Connor continued to work together as they had before, using the FAIRWAY FOX mark, for almost one year following Applicant's formation.

12

> beginning, we have agreed on a 50/50 split and I put my faith in your word … I will not continue with Fairway Fox without 50% ownership …

Opposer's ACR brief Ex. V. Ms. O'Connor responded the same day, stating "I am happy to discuss our business … Until such time as we can meet, I suggest we continue to work on the day-to-day deliveries of the product so as not to damage the brand we have developed." *Id.* There is no evidence regarding what precipitated this e-mail exchange.

After their falling out, the parties went their separate ways. In 2013, Opposer sold FAIRWAY FOX clothing on the "etsy.com" website, and dealt with vendors, using her d/b/a Fairway Fox. *Id.* Ex. W; Leibensperger Dec. ¶ 6. Simultaneously, Applicant sold FAIRWAY FOX clothing on its website. O'Connor Dec. ¶ 24, 30. In other words, whereas once there was a single source of FAIRWAY FOX products, i.e., the cooperative enterprise of Opposer and Applicant/Ms. O'Connor, there are now two sources of FAIRWAY FOX products, Opposer d/b/a "Fairway Fox" on the one hand and Applicant through its principal Ms. O'Connor on the other.

The FAIRWAY FOX mark was never assigned, transferred or licensed. There is no contract or other agreement of record addressing the disposition of the assets of the partnership or joint venture between Ms. Conolty and Ms. O'Connor (and Applicant) upon its dissolution.

**<u>Standing</u>**

Opposer has established her use of the trade name and trademark FAIRWAY FOX, through her d/b/a, for golf clothing. Opposer's ACR brief Exs. C, J, K, W, X; Applicant's ACR brief; O'Connor Dec. ¶¶ 1-20; Leibensperger Dec. ¶ 6-12. Applicant seeks registration of the same mark for the same goods. Accordingly, Opposer has demonstrated that she possesses a real interest in this proceeding beyond that of a mere intermeddler, and has a reasonable basis for her belief of damage. *Ritchie v. Simpson*, 170 F.3d 1092, 50 USPQ 1023 (Fed. Cir. 1999); *Lipton v. Ralston Purina Co.*, 670 F.2d 1024, 213 USPQ 185, 189-190 (CCPA 1982); *Automedx, Inc. v. Artivent Corp.*, 95 USPQ2d 1976, 1978 (TTAB 2010); *Giersch v. Scripps Networks, Inc.*, 90 USPQ2d 1020, 1022 (TTAB 2009) ("Petitioner has established his common-law rights in the mark DESIGNED2SELL, and has thereby established his standing to bring this proceeding."); *Syngenta Crop Prot. Inc. v. Bio-Chek LLC,* 90 USPQ2d 1112, 1118 (TTAB 2009) (testimony that opposer uses its mark "is sufficient to support opposer's allegations of a reasonable belief that it would be damaged …" where opposer alleged likelihood of confusion).

**<u>Ownership</u>**

"The primary function of a trademark is to identify and distinguish the goods or services of one source from those sold by all others . . . ." *BellSouth Corp. v. DataNational Corp.*, 60 F.3d 1565, 35 USPQ2d 1554, 1557 (Fed. Cir. 1995); *see also Johnson & Johnson v. E. I. du Pont de Nemours and Co., Inc.*, 181 USPQ 790, 791 (TTAB 1974) ("It is settled that the function of a trademark is to identify a single,

albeit anonymous, source of commercial sponsorship of the goods to which it pertains."). Therefore

> [l]egal recognition of more than one owner of a single mark is contrary to the basic definition of a mark as identifying and distinguishing a single seller's goods or services. … However, when an entity is dissolved and the business symbolized by the mark is divided among the separate participants, the potential arises for multiple and fragmented ownership of the trademark property. Under the "Customer Protection" policy, good will symbolized by a mark should be an indivisible asset.

J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*, § 16:40 (4th ed. 2014); *see also Meem-Haskins Coal Corp. v. Central Fuel Corp.*, 137 F.2d 242, 58 USPQ 605, 608-09 (CCPA 1943) ("[I]t often happens that by virtue of the conduct of the parties, more than one may use a trade-mark, but only one can have ownership of it in a trade-mark registration sense."); *Durango Herald Inc. v. Riddle*, 719 F. Supp. 941, 11 USPQ2d 1052, 1055 (D. Colo. 1988) ("one partner may not exploit the unique assets of the joint venture to the detriment of the other … Both Herald and Riddle have reciprocal duties not to use the primary asset of the 'DIRECTORY PLUS' joint venture for their individual benefit in a manner which burdens or injures only the other party").

More specific to the question of registration, which is the ultimate issue in this case (and the only issue within the Board's limited jurisdiction), "an application filed by one who is not the owner of the mark sought to be registered is a void application." *In re Tong Yang Cement Corp.*, 19 USPQ2d 1689, 1690 (TTAB 1991) (citing *In re Techsonic Industries, Inc.*, 216 USPQ 619 (TTAB 1982)). *See also*, 15

U.S.C. § 1051(a); *Huang v. Tzu Wei Chen Food Co., Ltd.*, 849 F.2d 1458, 7 USPQ2d 1335 (Fed. Cir. 1988); *Holiday Inn v. Holiday Inns, Inc.*, 534 F.2d 312, 189 USPQ 630, 635 n.6 (CCPA 1976) ("One must be the owner of a mark before it can be registered."); *Great Seats, Ltd. v. Great Seats, Inc.*, 84 USPQ2d 1235, 1239 (TTAB 2007) ("In a use-based application under Trademark Act Section 1(a), only the owner of the mark may file the application for registration of the mark; if the entity filing the application is not the owner of the mark as of the filing date, the application is void ab initio."); Trademark Rule 2.71(d).

Here, the record makes clear, and we accordingly find, that the involved application is void *ab initio* because applicant is not the sole owner of the mark. In fact, the evidence establishes that the first use of FAIRWAY FOX in commerce occurred during the January 2012 PGA show, and that the involved application was also filed in January 2012—which was several months prior to Conolty's and O'Connor's split. Prior to that time, Ms. Conolty and Ms. O'Connor were, by any practical measure, partners, who jointly controlled the quality of FAIRWAY FOX products and who were both, together, perceived as the source of FAIRWAY FOX products. Applicant effectively concedes the point:

> • "From the summer of 2008 to Opposer's resignation in May 2012 Opposer and Ms. O'Connor worked as partners." Applicant's ACR brief at 3.

> • "The founders [i.e., Ms. Conolty and Ms. O'Connor] attended the PGA Merchandise show in Orlando Florida where they accepted orders for two thousand four hundred seventy two ($2,472) dollars worth of merchandise." *Id.* at 5-6.

16

- "Opposer and Ms. O'Connor developed and used the FAIRWAY FOX mark together as Applicant Conolty O'Connor NYC LLC." *Id.* at 8.

- "The parties formed Applicant in June 2011 for the purpose of owning and operating the Fairway Fox business." *Id.* at 9-10.

- "Opposer and Ms. O'Connor were equally involved in the formation of Applicant." Applicant's Opposition to Opposer's ACR brief at 4.

- "This is not a case where two separate commercial enterprises were in existence on the application filing date. Rather, there has been only one commercial enterprise in existence. Opposer, Ms. O'Connor and Applicant are a single commercial enterprise." *Id.* at 5.

- "Opposer made no independent use of the mark prior to Ms. O'Connor and Opposer's partnership, and has no independent ownership interest in the mark." Applicant's Reply brief at 2.

- "From the beginning Opposer and Ms. O'Connor were co-founders and business partners." Leibensperger Dec. ¶ 12.

In short, Applicant is solely controlled by Ms. O'Connor, who has but a joint interest in the FAIRWAY FOX mark with Ms. Conolty. Because Applicant is not the sole owner of the mark, the application is void.[13] *Cf. American Forests v. Sanders*, 54 USPQ2d 1860 (TTAB 1999) (finding intent to use application filed by Barbara Sanders void *ab initio* because "the true entity which had a bona fide intent to use the mark LEAF RELEAF and design was not Barbara Sanders an individual, but

---

[13] The evidence reveals that Applicant did not "take over" the business in June 2011. Rather, following Applicant's formation, the business continued as it had, and it was not until May 2012, at the earliest, that Ms. O'Connor attempted to "take over."

17

rather was a partnership consisting of Stephen Sanders and Barbara Sanders"), *aff'd*, 232 F.3d 907 (Fed. Cir. 2000).

## Priority

If we analyze this case as a dispute over priority rather than ownership, the result is effectively the same. In fact, whether we find priority through technical trademark use as a result of sales at the PGA show in January 2012, or, as Opposer alleges, that before that time there was "use analogous to trademark use,"[14] rights in the FAIRWAY FOX mark accrued to the partnership or joint venture between Opposer and Ms. O'Connor/Applicant before the partnership or joint venture split up in May 2012. That is, to the extent that Ms. Conolty and Ms. O'Connor acted individually rather than together, their activities (for example, Ms. Conolty's dealing with vendors, developing samples and obtaining an EIN and RIN and Ms. O'Connor's registering domain names and operating the website) were on behalf of the partnership or joint venture. Any trademark rights resulting from the individuals' activities inured to the benefit of the business, jointly owned by the individuals, rather than the individuals themselves. These rights were not assigned to Ms. O'Connor alone or to Applicant alone, and Applicant therefore owns at most only a partial interest in the mark.

---

[14] To be clear, the record does not reveal that use of FAIRWAY FOX prior to January 2012 was sufficient to create an association in the minds of the purchasing public between the mark and the FAIRWAY FOX goods. *Herbko International, Inc. v. Kappa Books, Inc.*, 308 F.3d 1156, 64 USPQ2d 1375, 1378 (Fed. Cir. 2002); *T.A.B. Systems v. PacTel Teletrac*, 77 F.3d 1372, 37 USPQ2d 1879, 1882-83 (Fed. Cir. 1996). However, even assuming use analogous to trademark use prior to January 2012, that use was by and for the benefit of the partnership or joint venture between Ms. Conolty and Ms. O'Connor.

Applicant, currently solely owned by Ms. O'Connor, is not entitled to registration of a mark identical to the partnership or joint venture's mark, for the same exact goods, because that mark would be likely to create confusion in the minds of consumers who associate the mark with Ms. Conolty on the one hand *and* Ms. O'Connor or Applicant on the other.

## Applicant's Defenses

Applicant argues that waiver and estoppel bar the opposition because "[o]pposer agreed to Applicant's use of the mark 'Fairway Fox,' participated in Applicant's trademark use, and assisted in the submission of" the involved application. We disagree. The evidence establishes that Opposer (and for that matter Ms. O'Connor) intended for Opposer and Ms. O'Connor/Applicant to be partners, not that Ms. O'Connor should enjoy sole control of the FAIRWAY FOX mark or the application for registration thereof. There is no evidence whatsoever that Opposer ever "agreed" to the formation of an entity under Ms. O'Connor's sole control, or to such an entity's use or registration of the mark. The affirmative defenses of waiver and estoppel are accordingly rejected.

In its ACR brief, Applicant also alleges that laches bars the opposition. However, this defense was unpleaded and not tried by implied consent, and therefore we give it no consideration. *H.D. Lee Co. v. Maidenform Inc.*, 87 USPQ2d 1715, 1720-21 (TTAB 2008).[15]

---

[15] Of course, even if we were to consider the defense, it would be rejected because in an opposition proceeding laches is measured from the time when an applicant's mark is published for opposition. *National Cable Television Ass'n, Inc. v. American Cinema Editors, Inc.*, 937 F.2d 1572, 19 USPQ2d 1424, 1431-32 (Fed. Cir. 1991). In this case, Applicant's

In its answer, Applicant asserted, without explanation, that "Opposer is acting in bad faith and is barred from bringing this Opposition on the basis of unclean hands." However, Applicant did not pursue or prove this defense, which is therefore waived and will be given no further consideration. *Miller v. Miller*, 105 USPQ2d 1615, 1616 n.3 (TTAB 2013); *Baroness Small Estates Inc. v. American Wine Trade Inc.*, 104 USPQ2d 1224, 1225 n.2 (TTAB 2012).[16]

### Conclusion

The Board's jurisdiction is strictly limited to determining the "right to register."[17] We recognize that our determination concerning the right to register FAIRWAY FOX may not be sufficient to resolve Conolty's and O'Connor's larger business dispute, or to answer the many questions raised by Conolty's and O'Connor's business relationship and agreements. Nevertheless, the record makes clear that Applicant, which is under Ms. O'Connor's sole control, is not the sole owner of the FAIRWAY FOX trademark.

**Decision:** The opposition is sustained and registration of Applicant's mark is refused under Section 1(a) of the Trademark Act. The involved application is void *ab initio*.

---

mark was published on June 12, 2012, and Opposer filed its notice of opposition less than one month later. There is no evidence of record which would support a finding of laches under these circumstances.

[16] There is no evidence of record which would support a finding of bad faith or unclean hands.

[17] *Frito-Lay North America Inc. v. Princeton Vanguard LLC*, 100 USPQ2d 1904, 1907 (TTAB 2011) (emphasis in original) (citing TBMP § 102.01).